# UNITED STATES DISTRICT COURT
## DISTRICT OF IDAHO

| | |
|---|---|
| BIG SKY SCIENTIFIC LLC,<br><br>    Plaintiff,<br><br>vs.<br><br>IDAHO STATE POLICE, ADA COUNTY, JAN M. BENNETTS, in her official capacity as Ada County Prosecuting Attorney,<br><br>    Defendants, | Case No.: 1:19-cv-00040-REB<br><br>**MEMORANDUM DECISION AND ORDER RE:**<br><br>**PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**<br>**(Docket No. 2)** |

Pending before the Court is Plaintiff's Motion for Preliminary Injunction (Dkt. 2). Having carefully considered the record, heard oral argument, and otherwise being fully advised, the Court enters the following Memorandum Decision and Order:

## I. INTRODUCTION

On January 24, 2019, Idaho State Police ("ISP") seized a shipment of nearly 13,000 pounds of a cargo which was being transported across Idaho from Oregon to Colorado. The seizure occurred in conjunction with the arrest of the driver of the semi-truck pulling the shipment. Plaintiff, the owner of the seized load, claims that (1) the cargo is industrial hemp under provisions of the recently-enacted federal 2018 Farm Bill; (2) industrial hemp is not a controlled substance under federal law; and (3) Idaho cannot interfere with the interstate transportation of industrial hemp because of protections under federal law for interstate commerce. Defendants ISP, Ada County, and the Ada County Prosecuting Attorney contend that the seized cargo contains a controlled substance under Idaho state law and that the seizure of the cargo and the arrest of the driver were entirely proper under applicable law.

**MEMORANDUM DECISION AND ORDER - 1**

Plaintiff contends that the cargo is deteriorating and losing its value as it sits in ISP's possession, and that ISP's conduct in keeping the cargo in its possession threatens significant economic injury to the company as it seeks to enter the growing industry around hemp production and the manufacture of hemp products.  Because of these concerns, Plaintiff has asked for immediate relief from the Court in the form of a preliminary injunction requiring that the cargo be turned over to Plaintiff so that it can be transported the remainder of its journey and then processed for use in the manufacture of hemp products.

Because injunctive relief is an extraordinary remedy and only granted by a court under compelling circumstances, the Court must be satisfied that Plaintiff is likely to prevail on the merits of its claims about the legal status of the cargo and the meaning of the 2018 Farm Bill.  To that end, the Court must carefully examine the underlying dispute between the parties over whether the cargo contains industrial hemp that is not a controlled substance, or something else, and whether interstate commerce protections under federal law preclude Idaho's actions in seizing the cargo.  In doing so, the Court concludes, for the reasons described to follow and only for purposes of deciding Plaintiff's Motion for Preliminary Injunction, that Plaintiff is not likely to prevail on the merits of this lawsuit.  Therefore, the Court denies Plaintiff's Motion for Preliminary Injunction.

The 2018 Farm Bill decriminalizes industrial hemp, defining it as a form of the cannabis plant with a "delta-9 tetrahydrocannabinol concentration of not more than 0.3 percent on a dry weight basis."  It is described as an agricultural commodity and is removed from the federal schedule of controlled substances.  The 2018 Farm Bill also implements a detailed "plan" which regulates the production of hemp, intended to ensure that what is grown and sold as hemp under the 2018 Farm Bill (and therefore an agricultural commodity which can be transported in interstate commerce) is, in fact, hemp as defined and regulated under the 2018 Farm Bill.

**MEMORANDUM DECISION AND ORDER - 2**

The 2018 Farm Bill provides (in the Court's view) that as a now-legal agricultural commodity, states may not prohibit the transportation of industrial hemp that is produced within the regulatory framework that the 2018 Farm Bill prescribes.  That framework requires the United States Department of Agriculture to develop a federal plan for the production and regulation of hemp.  States and Indian tribes are permitted to create their own plans for the production and regulation of hemp, which would govern in place of the federal plan and can be more restrictive than the federal plan.  However, state and tribal plans must be approved by the federal government and cannot regulate hemp in a manner less restrictive than what federal law requires.

The facts of this case indicate that the cargo seized by ISP could not have been grown under either a federal or state plan implemented under the 2018 Farm Bill because neither the federal government nor the state of Oregon (where the hemp is alleged to have been grown, harvested, and shipped from) has yet enacted such a plan.  Still, Plaintiff contends that the cargo is hemp as defined under the 2018 Farm Bill and that, even if it was not produced under a federal or state plan as called for by the 2018 Farm Bill, the cargo is entitled to interstate commerce protections and Idaho wrongfully seized the cargo.  In making such an argument, Plaintiff contends that even if not produced under the plans required by the 2018 Farm Bill, there are other sources of hemp that remain legal under federal law and are entitled to protection from state interference in interstate commerce.

Based on the record currently before it, the Court concludes that Congress intended to create a regulatory framework around the production and interstate transportation of hemp for purposes of federal law, and that framework is to be contained in the federal (or compliant state or tribal) plan for production of hemp found in the 2018 Farm Bill.  In other words, Congress legalized the interstate transportation of hemp grown in the United States so long as the hemp

**MEMORANDUM DECISION AND ORDER - 3**

was produced within the statutory framework of the 2018 Farm Bill, which requires that it meet the requirements of an – as of this date – still undeveloped federal (or state or tribal) plan. Unless produced in compliance with such a plan, the cargo at issue in this case – whatever name is given to it – is not "hemp" as defined in the 2018 Farm Bill which is entitled to interstate commerce protections for purposes of transportation across state lines.  Therefore, the Court concludes that Plaintiff is not likely to prevail upon the merits of its case and, under applicable law, the Court cannot issue a preliminary injunction to grant the relief Plaintiff seeks at this time.

This Decision speaks only to Plaintiff's request for preliminary injunctive relief.  It is not a final judgment, although it is a ruling of the Court upon an issue which is largely a matter of law and as to which there may or may not be any further development of the record and argument before a final judgment on the requested underlying declaratory ruling is issued. Further, the Court does not make any final ruling here upon Defendants' argument that, even if the Court were to find that Plaintiff has made a sufficient case for issuance of injunctive relief under federal law, principles of comity and the application of the so-called *Younger* abstention doctrine should compel this Court not to issue the requested injunctive relief.

## II. <u>GENERAL BACKGROUND</u>[1]

### A.    The 2014 Farm Bill

1.    On February 7, 2014, President Barack Obama signed into law the Agricultural Act of 2014, Pub. L. No. 113-79 (known as the "2014 Farm Bill").  Though it did not remove industrial hemp[2] from federal controlled substance schedules, the 2014 Farm Bill did provide

---

[1]   Owing to the nature of the proceedings and the urgency involved, the Court incorporates, in large part, Plaintiff's version of the underlying factual backdrop leading up to the instant dispute.  To be clear, this is done for expediency and does not constitute a ruling of the Court upon such matters.

[2]   The terms "industrial hemp" and "hemp" are used interchangeably throughout this Decision when discussing the issues being decided here.  Industrial hemp is not marijuana,

that, notwithstanding the Controlled Substances Act or any other federal law, "an institution of higher education . . . or a State department of agriculture may grow or cultivate industrial hemp," *but only* if it is done "for purposes of research conducted under an agricultural pilot program or other agricultural or academic research" *and* those activities are allowed under the relevant state's laws.  *See* 7 U.S.C. § 5940(a).

2.      The 2014 Farm Bill defined industrial hemp as the plant Cannabis sativa L., or any part of such plant, "with a delta-9 tetrahydrocannabinol concentration of not more than 0.3 percent on a dry weight basis."  *Id*. at § 5940(b); *see also* Shore Decl., ¶ 3 (Dkt. 2-11).  Plaintiff contends that "[d]elta-9 tetrahydrocannabinol ('Δ-9 THC') is the principal psychoactive constituent of cannabis and the 'high' experienced by recreational users increases based upon the level of Δ-9 THC.  Because industrial hemp has a Δ-9 THC percentage of 0.3 percent or less on a dry weight basis, it has virtually no psychotropic effects and is not used recreationally."  *Id.*

3.      In 2016, Oregon passed legislation to establish an industrial hemp program allowing for the cultivation and regulation of industrial hemp in Oregon, complying with the 2014 Farm Bill's requirements.  *See, e.g.*, Or. Rev. Stat. § 571.33(1) (establishing framework "for the purpose of developing standards for investigating and testing an industrial hemp crop to ensure that the crop contains an average tetrahydrocannabinol concentration that does not exceed 0.3 percent of a dry weight basis.").

**B.      The 2018 Farm Bill**

4.      On December 20, 2018, President Donald Trump signed into law the Agriculture Improvement Act of 2018, Pub. L. No. 115-334 (known as the "2018 Farm Bill"), which expanded the definition of industrial hemp beyond the 2014 Farm Bill to include not only "the

---

though they are both cannabis (albeit different varieties of the Cannabis sativa species).  For the purposes of this Decision, their differentiating factor is their tetrahydrocannabinol ("THC") concentrations.

**MEMORANDUM DECISION AND ORDER - 5**

plant Cannabis sativa L. and any part of that plant," *but also* "the seeds thereof and all derivatives, extracts, cannabinoids, isomers, acids, salts, and salts of isomers, whether growing or not, with a delta-9 tetrahydrocannabinol concentration of not more than 0.3 percent on a dry weight basis."  2018 Farm Bill § 10113 (amending Agricultural Marketing Act of 1946 by adding "Subtitle G – Hemp Production" and including therein at section 297A(1), definition of "hemp").

     5.     In practical terms, the 2018 Farm Bill distinguished industrial hemp from marijuana, added industrial hemp to the list of agricultural commodities, and removed industrial hemp from federal controlled substance schedules.

     6.     Under the 2018 Farm Bill, states and Indian tribes may choose to regulate industrial hemp on their own, and "No Preemption" is intended of any law of a state or Indian tribe that "regulates the production of hemp" and "is more stringent" than federal law.  2018 Farm Bill § 10113 at section 297B(a)(3)(A)(i-ii) of "Subtitle G – Hemp Production."  In other words, though the 2018 Farm Bill removes industrial hemp as a controlled substance under federal law, states and Indian tribes still may declare it to be a controlled substance under state or tribal law.  Idaho does not distinguish industrial hemp from marijuana; both are controlled substances under Idaho law.

     7.     Of particular significance to this lawsuit, the 2018 Farm Bill also addressed industrial hemp in interstate commerce, stating:

SEC. 10114.  INTERSTATE COMMERCE

(a)  RULE OF CONSTRUCTION. – Nothing in this title or an amendment made by this title prohibits the interstate commerce of hemp (as defined in section 297A of the Agricultural Marketing Act of 1946 (as added by section 10113)) or hemp products.

(b)  TRANSPORTATION OF HEMP AND HEMP PRODUCTS. – No State or Indian Tribe shall prohibit the transportation or shipment of hemp or hemp products produced in accordance with subtitle G of the Agricultural Marketing Act of 1946

**MEMORANDUM DECISION AND ORDER - 6**

(as added by section 10113) through the State or the territory of the Indian Tribe, as applicable.

2018 Farm Bill § 10114(a-b).

**C.   Plaintiff Big Sky Scientific LLC**

8.      Plaintiff Big Sky Scientific LLC ("Big Sky") was incorporated on December 17, 2018 (three days before the 2018 Farm Bill was signed into law), purportedly to be among the very first companies to market in what it believed to be an imminent industry in industrial hemp. *See* Shore Decl., ¶ 4 (Dkt. 2-11).

9.      Big Sky set up operations in Aurora, Colorado to receive and process shipments of industrial hemp.  *See id*. at ¶ 5.  Big Sky describes its business as purchasing industrial hemp from state-licensed industrial hemp growers, shipping that industrial hemp to a processor who removes the isolates (typically cannabidiol ("CBD") powder) from the industrial hemp, and then selling the CBD powder to manufacturers of consumer products who add the CBD powder to a diverse range of products, including skin cream, pet care, nutritional supplements, and medical aids (to address epileptic seizures and anxiety).  *See id.* at ¶¶ 6-7.

10.      Big Sky claims that, by purchasing the industrial hemp and managing its processing to extract the isolates, including CBD powder, it is "positioning itself as a leader in the market for meeting the CBD demands of product manufacturers and the public."  *Id*. at ¶ 8.

**D.   The January 24, 2019 Arrest and Seizure**

11.      On January 23, 2019, Big Sky purchased approximately 13,000 pounds of industrial hemp from Boones Ferry Berry Farms ("Boones Ferry") in Hubbard, Oregon.  *See* Shore Decl., ¶ 11 (Dkt. 2-11); *see also* Snegirev Decl., ¶ 32 (Dkt. 26-4).  Big Sky represents that Boones Ferry is an industrial hemp grower licensed with the Oregon Department of Agriculture ("ODA").  *See* Shore Decl., ¶ 11 (Dkt. 2-11); *see also* Snegirev Decl., ¶¶ 9-11 (Dkt. 26-4) (owner and operator of Boones Ferry, discussing licensing fee, application process with ODA,

**MEMORANDUM DECISION AND ORDER - 7**

and his "Industrial Hemp Grower Registration license for this time period").[3, 4]  Big Sky intended

to have the industrial hemp shipped from Hubbard, Oregon to Big Sky's processor in Aurora,

Colorado.  *See* Shore Decl., ¶ 11 (Dkt. 2-11).

12.     Big Sky contracted with a third-party logistics company that arranged for Big

Sky's industrial hemp to be shipped from Hubbard, Oregon to Aurora, Colorado by a trucking

company named VIP Transporter LLC ("VIP").  *See id.* at ¶ 12.  It was shipped in multiple truck

loads.  *See id.*

13.     On January 24, 2019, a VIP semi-truck carrying a portion of the industrial hemp[5]

purchased by Big Sky was stopped at the East Boise Interstate 84 Port of Entry, in Ada County,

---

[3]  Mr. Snegirev's license was issued on January 31, 2018 and expired on December 31, 2018.  *See* Ex. A to Watkins Decl. (Dkt. 2-3).  Mr. Snegirev claims that he purchased industrial hemp seeds, planted them, and harvested the crop in 2018.  *See* Snegirev Decl., ¶¶ 12-15, 20-25 (Dkt. 26-4).  When questioned about the sequence of events during oral argument (specifically the fact that Mr. Snegirev's license had apparently expired before Boones Ferry sold the industrial hemp to Big Sky in January 2019), Big Sky's counsel said that the license was only a "grower's" license and did not impact Boones Ferry's sale of industrial hemp to Big Sky in 2019.  For the purposes of this Decision, the Court accepts this representation.

[4]  Big Sky contends that in multiple instances (before and after harvest) the industrial hemp crop from Boones Ferry was tested and certified as having a Δ-9 THC concentration level of 0.3 percent or less.  *See* Shore Decl., ¶¶ 9-11 (Dkt. 2-11); *see also* Exs. B & C to Watkins Decl. (Dkt. 2-4 & 2-5) (Chemhistory's 10/26/18 "Certificate of Analysis" and The Good Lab's 1/17/19 "Δ9-THC/CBD Potency Test Results"); *see also* Snegirev Decl., ¶¶ 16-20 (Dkt. 26-4) (discussing Chemhistory and Pixis Labs tests and stating:  "As far as I am aware, none of the lab results ever indicated that I was not growing industrial hemp or that my Crop had too much 'THC' in it to be considered industrial hemp. . . . .  I was notified by Chemhistory that ODA had approved my Crop as industrial hemp and that I was authorized to harvest it.").

[5]  Setting aside any chain-of-custody issues (and specifically as to what had previously been tested (*see supra*)) about whether the industrial hemp Big Sky purchased from Boones Ferry was included in the shipment that ISP seized on January 24, 2019, there is no evidence in the record that the seized load does not meet the definition of industrial hemp in the 2018 Farm Bill (having a Δ-9 THC concentration level of 0.3 percent or less).  The results of the different tests made part of the record by the parties vary significantly, however, to the point that the Court questions whether an "apples to apples" comparison is truly possible; regardless, no testing has reported a greater than 0.3 % concentration level of Δ-9 THC.  *Compare* Exs. B & C to Watkins Decl. (Dkt. 2-4 & 2-5), *with* Ex. A to Roscheck Decl. (Dkt. 30) (Fouser Environmental-Agriculture's 2/10/19 "Certificate of Analysis").  For the purposes of this Decision, the Court

Idaho.  *See id*. at ¶ 14.  According to Big Sky, the load was in plain sight in the cargo area of the

semi-truck trailer; the driver freely indicated that he was hauling hemp; the driver did not run or

otherwise try to escape; and the driver never tried to dispose of the load he was hauling.  *See*

Compl., ¶¶ 25-28 (Dkt. 1).  The bill of lading that accompanied the load showed that the

shipment consisted of 31 bags of "hemp" totaling approximately 7,000 pounds being transported

from Hubbard, Oregon to Aurora, Colorado.  *See id*. at ¶¶ 23-24; *see also* Ex. D to Watkins Decl.

(Dkt. 2-6).[6]

14.     A field test sample of the load tested presumptively positive for marijuana

(recognizing that Idaho does not distinguish between marijuana and industrial hemp (*see supra*)).

A drug-detection "K9" (dog) officer "alerted" to the presence of an odor of a controlled

substance within the load.  *See* Law Decl., ¶¶ 14-16 (Dkt. 24-3).  The driver of the VIP semi-

truck was then arrested and charged with felony trafficking in marijuana pursuant to I.C. § 37-

2732B(1)(C) on January 25, 2019 in Idaho state court.  *See* Watkins Decl., ¶ 7 (Dkt. 2-2); *see*

*also* County Defs.' Opp. to Emerg. Mot. for TRO/PI, p. 3 (Dkt. 23); Law Decl., ¶ 26 (Dkt. 24-

3).[7]  Defendant Idaho State Police ("ISP") seized the shipping truck's cargo, consisting of

---

assumes that the load consisted of industrial hemp, with a Δ-9 THC concentration level meeting
the definition of hemp in the 2018 Farm Bill.  The Court acknowledges that Defendants do not
concede the point, as they characterize the seized load as "contraband" under Idaho state law.
*See supra*; *see also* Law Decl., ¶ 28 (Dkt. 24-3) ("I myself and Cpl. Cottrell assisted ISP
detectives with processing the seized evidence.  There were 31 bags containing the green leafy
substance with a total weight of 6,701.4 pounds of *suspected marijuana*.") (emphasis added).

   [6]  A further potential disconnect is found in the fact that the bill of lading is not signed by
either the "shipper" or "carrier" (or anyone for that matter) in what otherwise would be a
certification that the cargo "materials are properly classified, described, packaged, marked, and
labeled, and are in proper condition for transportation according to the applicable regulations of
the Department of Transportation."  Ex. D to Watkins Decl. (Dkt. 2-6).

   [7]  ISP collected and sent eight different samples of the seized load to the Idaho State
Police Forensic Laboratory for further testing; each of the samples "contained marijuana or the
resins thereof."  Law Decl., ¶¶ 30-31 (Dkt. 24-3); *see also* Ex. B to Law Decl. (Dkt. 24-5) (Idaho
State Police Forensic Services 1/30/19 "Forensic Controlled Substance Analysis Report").

**MEMORANDUM DECISION AND ORDER - 9**

approximately 7,000 pounds of industrial hemp.  *See* Compl., ¶ 31 (Dkt. 1); *see also* Shore Decl.,

¶ 15 (Dkt. 2-11).[8]

**E.    The Pending Case in Federal Court**

15.    On January 28, 2019, after the driver's arrest and ISP's seizure of the load, Elijah

Watkins, counsel for Big Sky, called Shawna Dunn, the Chief Deputy Criminal Prosecutor for

Ada County.  *See* Watkins Decl., ¶ 8 (Dkt. 2-2).  He represented to Ms. Dunn that the load was

industrial hemp, not marijuana; told her that the 2018 Farm Bill's provision regarding interstate

transportation of industrial hemp preempts Idaho's state marijuana laws; described the value and

perishable nature[9] of the load; and said that Ada County and/or ISP should release the seized

industrial hemp or properly store it.  *See id.*  Mr. Watkins says that Ms. Dunn responded that the

load would not be released; that she could not dictate how the seized load was stored; that

industrial hemp is illegal under Idaho law regardless of the 2018 Farm Bill; and that if she was to

release the load to Mr. Watkins, she herself would be guilty of a felony.  *See id.* at ¶ 9.

16.    On January 29, 2019, Mr. Watkins emailed and hand-delivered a letter setting out

Big Sky's position to Defendant Jan Bennetts (the Ada County Prosecutor) and her Deputy Chief

Civil Prosecutor, and a largely-similar version of the same letter to Deputy Attorney General,

Merritt Dublin, who represents Defendant ISP.  *See* Exs. E & F to Watkins Decl. (Dkt. 2-7 & 2-

8).  Each letter attached reports from two different laboratories (*see supra*), represented to be

"state-accredited," along with a copy of Boones Ferry's "industrial hemp license" (*see supra*).

---

[8]  On February 6, 2019, ISP filed a Complaint In Rem for Forfeiture Under Idaho Code § 37-2744, asserting four Counts against the "Defendant Property" (identified as (1) the VIP semi-truck and trailer involved in the January 24, 2019 arrest and seizure, and (2) 6,701 pounds of "plant material controlled substances.").  Ex. A to Dublin Decl. (Dkt. 24-2).

[9]  Big Sky contends that "industrial hemp is perishable and will mold if proper airflow and climate are not maintained.  Once a bale molds, a processor can refuse it, making the bale worthless.  Even without mold, as harvested industrial hemp sits, the amount of CBD contained within it dissipates."  *See* Shore Decl., ¶ 17 (Dkt. 2-11).

**MEMORANDUM DECISION AND ORDER - 10**

*See* Exs. E & F to Watkins Decl. (Dkt. 2-7 & 2-8).  Big Sky contends that such documents reveal that the seized load was, in fact, industrial hemp under the 2018 Farm Bill.  *See id*.  In each letter, Mr. Watkins contended on behalf of Big Sky that the seizure of the industrial hemp was interference with interstate commerce and, as such, violated the 2018 Farm Bill and Supremacy Clause of the United States Constitution.  *See id*.

17.     Responses to both letters came on January 31, 2019, disagreeing with Big Sky's arguments that the 2018 Farm Bill applied to preclude ISP's January 24, 2019 seizure of Big Sky's load of industrial hemp.  *See* Exs. G & H to Watkins Decl. (Dkt. 2-9 & 2-10).  Counsel for Ada County and ISP set out their position that the regulatory framework for industrial hemp required by the 2018 Farm Bill had not yet been created, such that the seized load could not have been "produced in accordance with subtitle G of the Agricultural Marketing Act of 1946" as is required under section 10114(b) of the 2018 Farm Bill, and thus necessarily could not fall under the interstate commerce protections of the 2018 Farm Bill for the transportation of industrial hemp.  *See, e.g.*, Ex. H to Watkins Decl. (Dkt. 2-10) ("According to your letter, the contraband was produced in Oregon.  Based on our review, Oregon does not have a federally approved plan and the Secretary of the United States Department of Agriculture has yet to establish its own plan.  Thus, assuming for the sake of argument that the 2018 Farm Bill even applies, the contraband could not have been produced in accordance with subtitle G and Idaho is free to prohibit its transportation or shipment through the state.").

18.     On February 1, 2019, Big Sky filed this lawsuit pursuant to 28 U.S.C. § 2201 and FRCP 57, seeking a declaratory ruling as to Big Sky's rights under the 2018 Farm Bill, the Commerce Clause, and/or interstate commerce principles.  *See generally* Compl. (Dkt. 1). Specifically, Big Sky seeks a ruling declaring that (1) "Defendants improperly seized Big Sky's property and have improperly refused to return Big Sky's property after the seizure given the

**MEMORANDUM DECISION AND ORDER - 11**

language of the 2018 Farm Bill forbidding states from prohibiting the interstate transportation or shipment of industrial hemp through a state"; and (2) "Defendants improperly seized Big Sky's property and have improperly refused to return Big Sky's property after the seizure given the Commerce Clause and/or interstate commerce principles, which prevent state prohibition with the interstate shipment or transportation of a lawful good."  *Id.* at ¶¶ 42 & 50.

19.     On the same day, Big Sky filed its Emergency Motion for Temporary Restraining Order and Preliminary Injunction, seeking entry of a temporary restraining order and an injunction under FRCP 65 to enjoin Defendants "from violating the clear commands of the [2018 Farm Bill] and the Commerce Clause, and to order Defendants to immediately return Big Sky's property."  Mem. ISO Emerg. Mot. for TRO/PI, p. 1 (Dkt. 2-1).  Alternatively, citing to FRCP 66, Big Sky requested that the Court appoint an emergency receiver to safeguard Big Sky's "valuable, federally-protected property, pending final resolution of the matter."  Emerg. Mot. for TRO/PI, p. 2 (Dkt. 2).

20.     On February 2, 2019, the Court denied Big Sky's request for a temporary restraining order, ruling that such an order was not warranted because of serious questions about Big Sky's likelihood of success on the merits due to the incomplete status of the regulatory framework required by the 2018 Farm Bill and the connection between that regulatory framework and the interstate transportation of industrial hemp.  *See generally* 2/2/19 MDO (Dkt. 6).  Consistent with FRCP 65, the Court then set Big Sky's Motion for Preliminary Injunction for hearing and provided a schedule for the parties' briefing in the meantime.  *See id.* at p. 13; *see also generally* Notice (Dkt. 7).  As part of their briefing, the Court ordered the parties to include a discussion concerning a federal court's authority to order that property seized in connection with a state court criminal case be relinquished – either to a third-party or to a court-appointed receiver.  Notice, pp. 1-2 (Dkt. 7).

**MEMORANDUM DECISION AND ORDER - 12**

21.     On February 11, 2019, the Court held a hearing on Big Sky's Motion, at which time counsel for all parties appeared and argued.

### III.  LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 24 (2008).  "In each case, courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Id*.  As such, the "grant of a preliminary injunction is a matter committed to the discretion of the trial judge[.]" *Evans v. Shoshone-Bannock Land Use Policy Comm'n*, 736 F.3d 1298, 1307 (9th Cir. 2013).  This discretion allows courts to properly evaluate when it is appropriate to grant preliminary relief in light of the "infinite variety of situations which may confront it." *A.L.K. Corp. v. Columbia Pictures Indus., Inc.*, 440 F.2d 761, 763 (3rd Cir. 1971).

A preliminary injunction is only awarded upon a clear showing that the plaintiff is entitled to the requested relief. *See Winter*, 555 U.S. at 22.  To make this showing, district courts exercise their discretion according to a four-factor test mandated by traditional principles of equity. *See eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).  The test requires a plaintiff to demonstrate (1) a likelihood of success on the merits, (2) a likelihood of irreparable harm to the moving party in the absence of preliminary relief, (3) that the balance of equities tips in favor of the moving party; and (4) that an injunction is in the public interest. *See Winter*, 555 U.S. at 20-23.  The requirements are stated in the conjunctive, in that all four elements must be established to justify injunctive relief, but the court may apply a sliding scale test under which "the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011).  For example, "'serious questions going to the merits" and a

**MEMORANDUM DECISION AND ORDER - 13**

hardship balance that tips sharply toward the plaintiff can support issuance of an injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Id*.

A more stringent standard is applied where mandatory, as opposed to prohibitory, injunctive relief is sought. Prohibitory injunctions restrain a party from taking action and effectively "freeze[ ] the positions of the parties until the court can hear the case on the merits." *Heckler v. Lopez*, 463 U.S. 1328, 1333 (1983). Mandatory injunctions (such as Big Sky's request here) go well beyond preserving the status quo, as they order a party to take some action. *See Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009). Although the same general principles inform the court's analysis in deciding whether to issue mandatory or prohibitory relief, courts should be "extremely cautious" about ordering mandatory relief. *Martin v. Intl. Olympic Comm.*, 740 F.2d 670, 675 (9th Cir. 1984); *see also Garcia v. Google*, 786 F.3d 733, 740 (9th Cir. 2015) (although courts consider same factors in evaluating either type of preliminary injunction, standard for evaluating those factors for mandatory injunction is "doubly demanding."). Mandatory preliminary relief should not issue unless both the facts and the law clearly favor the moving party (not simply that the movant is likely to succeed) and extreme or very serious damage will result. *See Marlyn Nutraceuticals*, 571 F.3d at 879. In short, mandatory injunctions are not issued in doubtful cases, or where the party seeking an injunction could be made whole by an award of damages. *See id*.

## IV. DISCUSSION

### A. The Court Need Not Reach the Question of *Younger* Abstention at This Time[10]

_____

[10] The Court directed the parties to discuss the question of whether the Court has jurisdictional authority to compel the relinquishment of property seized in connection with a state criminal case. *See supra*. Defendants, drawing primarily upon the *Younger* abstention doctrine, argue "no" to the question, but also argue that the Court should abstain from exercising jurisdiction over Big Sky's request for equitable relief. *See* County Defs.' Opp. to Emerg. Mot.

The decision of the United States Supreme Court in *Younger v. Harris*, 401 U.S. 37 (1971) and the decisions which have followed its reasoning, "espouse a strong federal policy against federal-court interference with pending state judicial proceedings, absent extraordinary circumstances." *Middlesex Cnty. Ethics Comm. v. Garden State Bar Assoc.*, 457 U.S. 423, 431 (1982). "The policy rests on notions of comity and respect for state functions and was born of the concern that federal court injunctions might unduly hamper state criminal prosecutions." *Champion Int'l Corp. v. Brown*, 731 F.2d 1406, 1408 (9th Cir. 1984). These considerations of comity and federalism dictate that "'the *normal* thing to do when federal courts are asked to enjoin pending proceedings in state courts is not to issue such injunctions.'" *Ohio Civil Rights Comm'n v. Dayton Christian Schools, Inc.*, 477 U.S. 619, 626 (1986) (quoting *Younger*, 401 U.S. at 45) (emphasis in *Dayton*).

The United States Supreme Court has stated expressly that "[w]here a case is properly within [the *Younger*] category of cases, there is no discretion to grant injunctive relief." *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 816 n.22 (1976). *Younger* abstention is required when four conditions are met: "(1) a state-initiated proceeding is ongoing; (2) the proceeding implicates important state interests; (3) the federal plaintiff is not barred from litigating federal constitutional issues in the state proceeding; and (4) the federal court action would enjoin the proceeding or have the practical effect of doing so, i.e., would interfere with the state proceeding in a way that *Younger* disapproves." *San Jose Silicon Valley Chamber of Commerce Political Action Comm. v. City of San Jose*, 546 F.3d 1087, 1092 (9th Cir. 2008). Exceptions to *Younger's* application do exist, however, to include extraordinary circumstances,

---

for TRO/PI, pp. 4-6 (Dkt. 23); *see also* ISP's Opp. to Emerg. Mot. for TRO/PI, pp. 9-11 (Dkt. 24).

bad faith prosecution, harassment, or a flagrantly and patently unconstitutional statute.  *See Younger*, 401 U.S. at 45-46, 53-54.

In response to Defendants' arguments that *Younger* calls upon the Court to abstain from interfering with the existing state court proceedings (the criminal and civil in rem actions), Big Sky does not contend that the requisite conditions for abstention are somehow absent.  *Compare* County Defs.' Opp. to Emerg. Mot. for TRO/PI, pp. 5-6 (Dkt. 23) *and* ISP's Opp. to Emerg. Mot. for TRO/PI, pp. 9-11 (Dkt. 24), *with* Reply ISO Emerg. Mot. for TRO/PI, pp. 10-11 (Dkt. 26).[11]  Rather, Big Sky argues that its claims implicate an "overwhelming federal interest" (deriving from the importance of interstate commerce and the supremacy of the Constitution's Commerce Clause), contending that any state interest in the matter becomes secondary.  *Id.* (quoting *Harper v. Pub. Serv. Comm'n of W.VA.*, 396 F.3d 348, 356 (4th Cir. 2005)).[12]  But this argument – premised as it is on *Harper* – misses the salient point.

In *Harper*, an Ohio solid waste disposal service challenged a West Virginia statute prohibiting any common carriers engaged in solid waste disposal from operating in West Virginia unless they obtained a certificate of convenience and necessity from the state Public Service Commission ("PSC").  *See Harper*, 396 F.3d at 350.  The PSC ordered the Ohio

---

[11]  Big Sky points out that ISP's civil in rem action was not initiated until after Big Sky filed this lawsuit, implying that the parties' sequence of legal filings somehow supports its claim for relief (at least on the issue of abstention) notwithstanding Defendants' arguments to the contrary.  *See* Reply ISO Emerg. Mot. for TRO/PI, pp. 10-11 (Dkt. 26).  However, such an argument overlooks the criminal action's earlier filing, and the fact that very little took place in this case between its February 1, 2019 filing date and the civil in rem action's February 6, 2019 filing date, other than the Court denying Big Sky's request for a temporary restraining order. *See, e.g.*, *Nationwide Biweekly Admin., Inc. v. Owen*, 873 F.3d 716, 728 (9th Cir. 2017) ("State proceedings are 'ongoing' if they are initiated before any proceedings of substance on the merits have taken place in the federal court.  Put another way, the commencement of state proceedings only ceases to require federal abstention after the federal court proceedings have moved beyond an 'embryonic stage.'") (internal quotation marks and citations omitted).

[12]  Though not explicitly stated, the Court construes such an argument as representing the "extraordinary circumstances" exception to *Younger*.

**MEMORANDUM DECISION AND ORDER - 16**

company to cease collecting solid waste in West Virginia.  *See id*. at 351.  The Ohio company

sued the PSC in federal district court and the district court abstained under *Younger*.  *See id*.  The

Ohio company appealed.  *See id*.

On appeal, the Fourth Circuit ruled that whether abstention was appropriate under

*Younger* turned on whether the state interest was "important" enough to require abstention.  *Id*. at

352.  The circuit court said no, finding that the state's "interest in limiting interstate access to the

waste removal market" was impermissible and "by its very nature serves to impede interstate

commerce."  *Id*. at 355.  As a result, because the PSC provision in question "squarely

implicat[ed] the Commerce Clause" (indeed, patently violated the Constitution) the circuit court

concluded that the state's interest could never be strong enough to require abstention under

*Younger*.  *Id*. at 357.

Whatever template can be drawn from *Harper* does not neatly align with the facts of this

case.  Here, the state interests at play in the state court proceedings relate to the enforcement of

Idaho's controlled substance laws, keeping in mind that civil forfeiture statutes aid the

enforcement of criminal laws.  *See U.S. v. One 1985 Mercedes*, 917 F.2d 415, 419 (9th Cir.

1990); *see also Loch v. Watkins*, 337 F.3d 574, 579 (6th Cir. 2003) ("[S]tate's interest in these

forfeiture proceedings is likely to be as great as its interest in its criminal law proceedings.").

These interests neither "squarely implicat[e]" the Commerce Clause as they did in *Harper*, nor

do they amount to a per se constitutional violation as was laid bare in *Harper*.  Instead, such

interests simply represent the recognized (and expected) administration of Idaho's criminal

justice system – nothing more.  *See, e.g.*, *Kelly v. Robinson*, 479 U.S. 36, 49 (1986) ("This Court

has recognized that the States' interest in administering their criminal justice systems free from

federal interference is one of the most powerful of the considerations that should influence a

court considering equitable types of relief.") (citing *Younger*, 401 U.S. at 44-45).  Moreover, the

**MEMORANDUM DECISION AND ORDER - 17**

circuit court in the *Harper* case *expressly acknowledged* the legitimacy of such interests in the

context of *Younger* abstention, stating in no uncertain terms:

> For this reason of comity, we hold fast to the notion that when an interest central to
> a case implicates the sovereignty and dignity of a state, and when the other
> requirements set forth in *Middlesex County* are met, federal courts should abstain.
> *Interests like education, land use law, family law, and criminal law lie at the heart
> of state sovereignty, and a failure to abstain in the face of ongoing state
> proceedings would disrespect the allocation of authority laid in place by the
> Framers.*   In other words, that which must be respected through "comity" is
> identical to the traditional areas of paramount state concern, and also the same as
> the "important state interests" test of *Middlesex County*.   When a state interest does
> not fit one of these characterizations, it will likely fail to satisfy any other, for they
> are all shorthand for the structural values of "Our Federalism" that Justice Black
> described [in *Younger*].

*Harper*, 396 F.3d at 354 (internal quotation marks and citations omitted, emphasis added).

Because the state interests involved in *Harper* are not the same as are present in this case, the

holding in *Harper* does not obviously support an exception to *Younger* abstention here.

This is not to say that *Younger* absolutely calls for either the Court's abstention from

certain of the matters before it, or outright dismissal of the action.  To be sure, there are nuances

to *Younger's* application that stem from Plaintiff's requested relief, which is, in part, to have the

Court make a declaratory ruling about issues of federal law and, in part, to have the Court issue

injunctive relief directed at Defendants in regard to the criminal prosecution and related

forfeiture cases that are pending in state court.  On the one hand, a judgement declaring rights

under the 2018 Farm Bill can be viewed as just that – a declaratory ruling as to what constitutes

industrial hemp under federal law, subject to Commerce Clause protections under the facts of

this case.  Such a ruling might be of interest to the judges presiding in the state court cases, but

the ruling would not bind or direct any particular action or decision from those courts and

therefore would not interfere with judicial comity or the other underlying policies of the *Younger*

abstention doctrine.  But, on the other hand, an injunction requiring that the seized cargo be

**MEMORANDUM DECISION AND ORDER - 18**

turned over to Big Sky *post haste* can be viewed as at least impacting the state court proceedings as they are only beginning.

In such a setting, it cannot be said that *Younger* abstention must apply at this time. *See, e.g.*, *Adibi v. Cal. State Bd. of Pharmacy*, 461 F. Supp. 2d 1103, 1109 (N.D. Cal. 2006) ("[T]he Court notes that the issue of *Younger* abstention can be addressed by a federal court at any time no matter how far along the litigation is. Indeed, there are cases in which the issue of *Younger* abstention was considered for the first time on appeal.").[13]  This Decision, of course, only decides whether Plaintiff is entitled to preliminary injunctive relief. The details announced here are therefore not a final judgment of the Court. Hence, the constraint, if any, that *Younger* places upon a final judgment remains to be seen. Right now, the Court holds only that *Younger's* application need not be unfolded at present, given the Court's ruling upon the requested injunctive relief.

**B.     Big Sky Has Not Shown a Likelihood of Success on the Merits**

Big Sky argues that it will prevail on the merits because the seized load is industrial hemp; industrial hemp is now legal under the 2018 Farm Bill; and Congress has preempted Idaho from restricting industrial hemp in interstate commerce. *See* Mem. ISO Emerg. Mot. for TRO/PI, pp. 12-17 (Dkt. 2-1). Defendants disagree, arguing that (1) the 2018 Farm Bill did not (and still does not) prohibit ISP from seizing industrial hemp, including the the at-issue load of

---

[13]   Separately, the abstention issue was presented for the first time in response to Big Sky's Motion, rather than a formal FRCP 12 motion challenging the Court's jurisdiction to consider Big Sky's claims. *See* 5B Wright & Miller Federal Practice and Procedure: Civil 3d § 1350 ("Courts have recognized a variety of other defenses that one normally would not think of as raising subject matter jurisdiction questions when considering a Rule 12(b)(1) motion, including claims that the plaintiff's suit is barred by the governing statute of limitations, a matter that usually is thought of as a Rule 8(c) affirmative defense; the action is not ripe for judicial adjudication; *or the subject matter is one over which the federal court should abstain from exercising jurisdiction*.") (emphasis added). It matters not whether one procedural avenue is more appropriate than another; rather, the significance is that, if necessary, Defendants may renew their arguments relating to *Younger* abstention.

**MEMORANDUM DECISION AND ORDER - 19**

industrial hemp[14] seized on January 24, 2019, and (2) the Commerce Clause does not preempt

Idaho's controlled substances laws.  *See* County Defs.' Opp. to Emerg. Mot. for TRO/PI, pp. 8-

13 (Dkt. 23); ISP's Opp. to Emerg. Mot. for TRO/PI, pp. 12-14 (Dkt. 24).

    1.    <u>The 2018 Farm Bill Did Not Prevent ISP's Seizure of Industrial Hemp</u>

The 2018 Farm Bill not only legalizes industrial hemp federally, it specifically addresses

its transportation in interstate commerce as follows:

SEC. 10114.  INTERSTATE COMMERCE

(a)  RULE OF CONSTRUCTION. – Nothing in this title or an amendment made
by this title prohibits the interstate commerce of hemp (as defined in section 297A
of the Agricultural Marketing Act of 1946 (as added by section 10113)) or hemp
products.

(b)  TRANSPORTATION OF HEMP AND HEMP PRODUCTS. – No State or
Indian Tribe shall prohibit the transportation or shipment of hemp or hemp products
produced in accordance with subtitle G of the Agricultural Marketing Act of 1946
(as added by section 10113) through the State or the territory of the Indian Tribe,
as applicable.

2018 Farm Bill § 10114(a-b).  The parties' respective interpretations of this section and its

subparts frame the lynchpin issue:

- Big Sky submits that "[t]he proper way to read [section] 10114(a) and (b)
  together is (a) not a single thing can be used in the 2018 Farm Bill to prohibit
  the interstate transportation of hemp, and (b) if states choose to establish subtitle
  G plan, such plan cannot include language that prohibits the interstate
  transportation of hemp."  Reply ISO Emerg. Mot. for TRO/PI, p. 6 (Dkt. 26).

- Defendants contend that "Section 10114(a) simply acknowledges that nothing
  in the cited federal laws prohibits the interstate commerce of hemp or hemp
  products.  The provision does not purport to further regulate the production,
  transportation, or shipment of hemp or hemp products by states or otherwise.
  Nor does it imply that state laws cannot prohibit such conduct.  When viewed
  in context with section 10114(b), . . . it is apparent that subsection (a) just

---

[14]  Again, the Court assumes that the seized load consisted of industrial hemp, as defined
by the 2018 Farm Bill.  *See supra*.  Whether the seized load is, in fact, industrial hemp under the
2018 Farm Bill definition (*see* 2/2/19 MDO, p. 10 n.5 (Dkt. 6)), is a question that need not be
answered here before resolving Big Sky's Motion.

**MEMORANDUM DECISION AND ORDER - 20**

creates a foundation upon which Congress may build the remainder of the legal framework for producing and regulating hemp.

Section 10114(b) precludes states from prohibiting the transportation or shipment of hemp only if that hemp is "produced in accordance with subtitle G of the Agricultural Marketing Act of 1946 (as added by section 10113)." County Defs.' Opp. to Emerg. Mot. for TRO/PI, p. 10 (Dkt. 23); *see also* ISP's Opp. to Emerg. Mot. for TRO/PI, pp. 12-13 (Dkt. 24) ("First, and most obviously fatal to Plaintiff's claims, . . . paragraph (b) <u>plainly and unambiguously</u> specifies what hemp the states shall not prohibit the transportation of – and it is only hemp 'produced in accordance with subtitle G of the Agricultural Marketing Act of 1946 *(as added by section 10113)*' . . . . . Accordingly, states are not now prohibited from preventing the interstate transportation of hemp through their state because of the lack of any state or federal regulations.") (emphasis in original).

These divergent positions require the Court to undertake a statutory construction analysis to determine the meaning of section 10114.

When interpreting statutes, courts "first determine whether the statutory text is plain and unambiguous." *Carcieri v. Salazar*, 555 U.S. 379, 387 (2009). "If it is, [the court] must apply the statute according to its terms." *Id.*; *see also Hernandez v. Williams, Zinman & Parham PC*, 829 F.3d 1068, 1072-73 (9th Cir. 2016) ("Because we must presume that [the] legislature says in a statute what it means and means in a statute what it says there, if we find that the statutory meaning is plain and unambiguous, then our sole function is to enforce it according to its terms.") (internal quotation marks and citations omitted). "Only when statutes are ambiguous may courts look to legislative history." *In re Del Biaggio*, 834 F.3d 1003, 1010 (9th Cir. 2016). "A statute is ambiguous if it gives rise to more than one reasonable interpretation." *Woods v. Carey*, 722 F.3d 1177, 1181 (9th Cir. 2013) (internal quotation marks omitted). Courts "must analyze the statutory provision in question in the context of the governing statute as a whole, presuming congressional intent to create a coherent regulatory scheme." *Padash v. I.N.S.*, 258 F.3d 1161, 1170 (9th Cir. 2004). "In this regard, [the court] must make[e] every effort not to interpret [the] provision [at issue] in a manner that renders other provisions of the same statute

**MEMORANDUM DECISION AND ORDER - 21**

inconsistent, meaningless, or superfluous." *Id*. at 1170-71; *see also TRW, Inc. v. Andrews*, 534

U.S. 19, 31 (2001) ("It is 'a cardinal principle of statutory construction' that a statute ought, upon

the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be

superfluous, void, or insignificant.") (quoting *Duncan v. Walker*, 533 U.S. 167, 174 (2004));

*United States v. Menasche*, 348 U.S. 528, 538-39 (1955) ("It is our duty to give effect, if

possible, to every clause and word of a statute.").

Applying these considerations to section 10114 in its entirety and giving effect to each

provision of the 2018 Farm Bill's treatment of industrial hemp, the Court agrees with Big Sky

that subsection (a) authorizes interstate commerce of industrial hemp.  But the immediately-

following portion of the statute – subsection (b) – must be read in conjunction with subsection

(a).  In subsection (b), Congress describes the particular circumstances under which the

transportation or shipment of industrial hemp may or may not be restricted by states.  These are

entirely consistent propositions.  Read together, subsections (a) and (b) allow industrial hemp to

be transported across state lines in interstate commerce (even if a particular state – like Idaho –

on the route criminalizes any kind of cannabis) so long as certain conditions are met – namely,

that the industrial hemp is "produced in accordance with subtitle G."

Significantly, Big Sky's offered interpretation of section 10114 would read out section

10114(b)'s requirement that, consistent with section 10114(a), states and Indian tribes may not

prohibit the transportation of industrial hemp produced "in accordance with subtitle G."  In

contrast, the Court's interpretation of subsections (a) and (b), with the entirety of subtitle G's

treatment of hemp in mind, operates to confirm that the transported hemp is exactly what it

purports to be.[15]

---

[15]  The Court rejects any argument that such a reading of section 20114 would
unreasonably and inefficiently require state law enforcement and regulatory officials to keep
track of which states have had their plans federally-approved and, thus, lead to absurd results.

**MEMORANDUM DECISION AND ORDER - 22**

The connecting lines in the 2018 Farm Bill are found in the fact that Subtitle G not only defines industrial hemp, it also (1) requires the Secretary of the United States Department of Agriculture to create a federal regulatory plan for industrial hemp production and (2) outlines how states (and Tribes) can create their own regulatory plan for hemp production consistent with the federal requirements.  Subtitle G contains agronomy record-keeping requirements, inspection requirements, enforcement requirements, and other details which create a statutory frame inside of which industrial hemp can be grown, marketed, and transported in the United States.  *See* 2018 Farm Bill § 10113 at sections 297B-297D of "Subtitle G – Hemp Production"; *see also* County Defs.' Opp. to Emerg. Mot. for TRO/PI, pp. 10-11 (Dkt. 23) (discussing subtitle G's regulatory framework for regulating industrial hemp, including state plans, federal approval of state plans, and federal plan in absence of state plans).

At some future date, industrial hemp that has been "produced in accordance with subtitle G" will undoubtedly be transported in interstate commerce across states like Idaho that have not legalized industrial hemp.  Leaving aside any other challenges Idaho might suggest could be raised against such transport, the date has not yet arrived and the cargo that was seized on January 24, 2019 was not hemp that has been "produced in accordance with subtitle G."  It could not have been produced in accordance with subtitle G because Oregon does not have a federally-approved plan and the Secretary of the United States Department of Agriculture has yet to establish its own plan as Subtitle G requires be done.  This is undisputed.  It matters not whether

---

*See, e.g.*, *Amicus Curiae* U.S. Hemp Roundtable, Inc.'s ("Roundtable") Brief, p. 10 (Dkt. 25-1). The 2018 Farm Bill plainly contemplates "information sharing for law enforcement," requiring the Secretary of the United States Department of Agriculture to (1) compile information relating to a state or tribal plan under subtitle G (including contact information for each hemp producer in a state or territory of an Indian tribe, a legal description of the land on which hemp is grown by each identified hemp producer, and the status of each hemp producer's license), and (2) "*make the information collected . . . accessible in real time to federal, state, territorial, and local law enforcement.*"  2018 Farm Bill § 10113 at section 297C(d) of "Subtitle G – Hemp Production" (emphasis added).

**MEMORANDUM DECISION AND ORDER - 23**

the cargo might meet the requirements of subtitle G if such a plan (or something similar) had existed when the crop was grown and harvested, or whether the implementation of the production plan by the Department of Agriculture was delayed somehow because of the recent shutdown of certain operations of the federal government.  There simply is no such plan in place and therefore the cargo, whether described as hemp or marijuana, could not have been produced in accordance with subtitle G and therefore could not be subject to the protection of interstate commerce as provided by the 2018 Farm Bill.

     2.    <u>The Commerce Clause Does Not Preempt Idaho's Controlled Substance Laws on These Facts</u>

Plaintiff argues that, even if the 2018 Farm Bill did not apply, Idaho still "cannot interfere with the shipment of goods between states because Congress has preempted virtually all of interstate commerce."  Mem. ISO Emerg. Mot. for TRO/PI, p. 15 (Dkt. 2-1).  This argument presumes that interstate hemp is now legal, which is only possible when considering the 2018 Farm Bill.  *See id.* at 17 ("While Idaho law may have remained the same, federal law as it concerns the interstate shipment of industrial hemp has drastically changed.  Defendants are prohibited from shutting down the interstate commerce of industrial hemp under the explicit language of the 2018 Farm Bill as well as under Congress's preemption over the interstate travel of lawful goods.").[16]  Therefore, the question of the Commerce Clause's reach for the purposes

---

[16] In its reply brief, Big Sky argues for the first time that, regardless of the 2018 Farm Bill itself, Idaho has separately decriminalized industrial hemp under Idaho Code section 37-2702(d) *in light of* the 2018 Farm Bill.  *See* Reply ISO Emerg. Mot. for TRO/PI, p. 3 (Dkt. 26); *see also* I.C. § 37-2702(d) ("If any substance is . . . deleted as a controlled substance under federal law . . . the board shall similarly control the substance under this act by promulgating a temporary rule or proposing a statutory amendment, or both, within thirty (30) days from publication in the federal register of a final order . . . deleting a substance, unless within that thirty (30) day period, the board objects to . . . deletion.").  Big Sky seems to claim that the decriminalization of industrial hemp at the federal level has translated (or will translate) to Idaho likewise legalizing industrial hemp, simply by "operation of law."  *See* Reply ISO Emerg. Mot. for TRO/PI, pp. 3, 5-6 (Dkt. 26) ("This is doubly true [(Idaho's alleged violation of the Commerce Clause)] where, as here, Idaho's own statute has already presumptively

of possibly preempting Idaho law in this case must begin with the 2018 Farm Bill.  *See Man Hing Ivory & Imports, Inc. v. Deukmejian*, 702 F.2d 760, 762-63 (9th Cir. 1983) ("Absent any preempting federal law, [California Penal Code § 653o] would clearly prohibit the activities in which appellee wishes to engage. . . . .   Whether, as Man Hing argues, such extensive federal legislation preempts otherwise valid state law is a question of Congressional intent.  'Congress's purpose is most clear, of course, when the federal statute at issue explicitly prohibits state regulation in the same field.'") (quoting *Pacific Legal Found. v. State Energy Res. Conserv. & Dev. Comm'n*, 659 F.2d 903, 919 (9th Cir. 1981)).

In *Man Hing Ivory*, California banned the possession of African elephant parts within its borders (California Penal Code § 653o), while federal law (50 C.F.R. § 17.40(e)) allowed such trade pursuant to a federal permit.  *See Man Hing Ivory*, 702 F.2d at 761-62.  Because the federal law (the Endangered Species Act and its implementing regulations) explicitly stated that states could not interfere with such trade if done pursuant to a federal permit, and because the appellee had obtained a federal permit, the court determined that federal law preempted state law.  *See id*. at 764 ("The district court determined that the effect of section 17.40(e) is to preempt operation of California Penal Code § 630o insofar as the state statute prohibits trade in elephant products by an authorized federal permittee.  We agree. . . . .   This language, together with the provisions of 50 C.F.R. § 14.40(e), preclude California's enforcement of section 653o where it would prohibit federally authorized trade in African elephant products.").

---

decriminalized industrial hemp in Idaho by operation of law. . . . .   It appears that it [(industrial hemp)] is currently legal in Idaho by operation of law.") (emphasis in original).  Defendants disagree that Idaho law mirrors federal law in the way Big Sky proposes, claiming during oral argument that, whatever practice may have existed in the past, it has not yet happened here.  The prospect of change is in the air, and the Court takes judicial notice of the fact that legislation has been introduced in this 2019 session of the Idaho Legislature which would decriminalize industrial hemp.  However, the detail of significance is this – as of this date, Idaho has not decriminalized industrial hemp.

**MEMORANDUM DECISION AND ORDER - 25**

Importantly, in *Man Hing Ivory*, it was the terms of the Endangered Species Act and its implementing regulations that defined the limits of the applied preemption.  *See also Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 517 (1992) ("Congress' enactment of a provision defining the pre-emptive reach of a statute implies that matters beyond that reach are not pre-empted."); *see also N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 655 (1995) (where federal law is said to bar state action in fields of traditional state regulation, there is presumption that "historic police powers of the States" are not to be superseded by federal law "unless that was the clear and manifest purpose of Congress").  Accordingly, assuming preemption, it is the specific words of the 2018 Farm Bill that dictate the scope of any preemption over Idaho law.

And, as discussed above, under section 10114(b), states cannot "prohibit the transportation or shipment of hemp or hemp products produced in accordance with subtitle G of the Agricultural Marketing Act of 1946 . . . ."  *See supra*.  But because the cargo seized by ISP on January 24, 2019 was not hemp produced in accordance with subtitle G, any preemption created by the 2018 Farm Bill does not attach.  In other words, nothing in the 2018 Farm Bill indicates that Congress had a clear and manifest purpose to displace state laws prohibiting the transportation of hemp that was *not* produced in accordance with subtitle G.[17]  Therefore, neither the Commerce Clause nor the 2018 Farm Bill preempts Idaho's controlled substances laws as they pertain to cannabis that does not meet the definition of hemp produced under subtitle G of the 2018 Farm Bill.[18]

---

[17]  Of course, the converse also is true, *i.e.*, had the cargo seized by ISP on January 24, 2019 been hemp produced in accordance with subtitle G, the 2018 Farm Bill would have preempted Idaho's controlled substances laws.

[18]  To the extent Big Sky argues that absent preemption under the Commerce Clause, "Congress [will have] just invalidated millions of tons of hemp that were produced legally under the 2014 Farm Bill by 41 states and approximately $60 million worth of hemp imported into the

The remaining task is to measure the conclusions drawn by the Court against the *Winter* factors.  That step begins and ends with the first factor – the likelihood of success on the merits. For the reasons described above, Big Sky is not likely to succeed on the merits under either the baseline *Winter* standard or the heightened standard applicable to mandatory injunctions.  Nor is the Court persuaded (even if it found some uncertainty as to whether Big Sky is not likely to prevail on the merits) that the costs outweigh the benefits of not granting the injunction and therefore injunctive relief should issue.  As a result, it is not necessary to consider the other factors against the present record.  *See Garcia*, 786 F.3d at 740 ("Because it is a threshold inquiry, when 'a plaintiff has failed to show the likelihood of success on the merits, we need not consider the remaining three [*Winter*] elements.'") (quoting *Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris*, 729 F.3d 937, 944 (9th Cir. 2013)).  This is not to say that Big Sky could not possibly prevail on the merits after further and final proceedings; rather, only that, after the Court has considered the possible evidentiary and legal issues identified above, Big Sky has not persuaded the Court that it is likely to succeed on the merits.

///

///

///

///

///

---

United States from foreign countries," such an argument does not dictate the result where the law does not support the argument, and the argument appears to be overstated regardless. Reply ISO Emerg. Mot. for TRO/PI, p. 2 (Dkt. 26) (citing to *Amicus Curiae* Roundtable's Brief, p. 10 (Dkt. 25-1)).  The 2018 Farm Bill is less than two months old; the Court's consideration of its application to events following its recent enactment is limited to just that, and the Decision here in no way speaks to or affects either (1) the 2014 Farm Bill's relation to the existing industrial hemp industry, (2) the ability of states who have already legalized industrial hemp to maintain and follow its practices regarding the production and transport of industrial hemp, or (3) the fact that the 2018 Farm Bill legalized industrial hemp at the federal level.

**MEMORANDUM DECISION AND ORDER - 27**

## V.  <u>ORDER</u>

Based upon the foregoing, IT IS HEREBY ORDERED that Plaintiff's Motion for Preliminary Injunction (Dkt. 2) is DENIED.  The Court will separately issue an order setting a scheduling conference to govern the case going forward.

DATED: February 19, 2019

Ronald E. Bush
Chief U.S. Magistrate Judge